

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Jason A. Yonan (312) 353-0708
AUSA Saurish Appleby-Bhattacharjee (312) 469-6045

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

KENNETH E. COURTRIGHT

CASE NUMBER: 20 CR 77
UNDER SEAL

MAGISTRATE JUDGE CUMMINGS

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about January 2017 to at least October 2019, at Minooka, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Section 1343 | Defendant devised, intended to devise, and participated in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme, knowingly caused a wire communication in interstate commerce, namely, a September 7, 2017, wire transfer of $275,000 from Investor A to Today's Growth Consultants Inc. |

FILED
FEB - 4 2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

BRENT E. POTTER
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: February 4, 2020

City and state: Chicago, Illinois

JEFFREY I. CUMMINGS, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT )
)
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Brent E. Potter, first being duly sworn under oath, hereby depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and I am assigned to its Chicago Division. I have been employed by the FBI as a Special Agent for over 23 years, during which time I have conducted many financial fraud investigations. I am currently assigned to an FBI squad dedicated to the investigation of federal securities, wire and mail fraud offenses, as well as related financial crimes.

2. This affidavit is submitted in support of the attached criminal complaint. The information contained in this affidavit is based upon my personal knowledge, as well as information provided to me by other law enforcement officers. It is also based upon my review of subpoenaed records, records obtained without the use of a grand jury subpoena, on information provided to me by non-law enforcement personnel, and on information submitted as part of a pending civil case, *SEC v. Todays Growth Consultant Inc.*, 19 CV 8454 (N.D. Ill.). Because this affidavit is submitted for the limited purpose of establishing probable cause with regard to the attached criminal complaint, it does not set forth each and every fact that I have learned during this investigation.

3. This affidavit is made for the limited purpose of establishing probable cause to support the attached criminal complaint alleging that, from no later than January 2017, and continuing through at least October 2019, Kenneth D. Courtright engaged in a scheme or artifice

to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme or artifice to defraud, caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, in violation of Title 18, United States Code, § 1343 (wire fraud).

## SUMMARY

4. Courtright is the founder, co-owner and current Chairman of Today's Growth Consultant, Inc. ("TGC"), a corporation organized under the laws of the State of Illinois and headquartered in Courtright's Minooka, Illinois residence. TGC's only other co-owner is Courtright's wife.

5. From at least January 2017 and continuing through October 2019, Courtright and TGC have raised at least $75 million from more than 500 investors who executed "Consulting Performance Agreements," in which TGC purported to provide investors with a minimum guaranteed rate of return, in perpetuity, based upon revenues generated by websites that TGC acquires or builds for the investor and then develops, maintains and hosts.

6. The money raised by Courtright and TGC from investors was referred to as an "Upfront Fee" by Courtright and TGC. Courtright and TGC represented in the Consulting Performance Agreements signed with investors that the investors' Upfront Fees would only be used for the purpose of purchasing, maintaining, hosting or constructing income producing websites on the specific investor's behalf. In his advertising and in TGC contracts issued to investors, Courtright told investors that TGC only made money from the websites that it purchased or built for investors, not from the investors themselves.

2

7.  TGC's Consulting Performance Agreements, which were advertised on websites and via radio advertisements, guaranteed high returns to investors. In the agreements, TGC promised investors the larger of either 50% of their website revenues or a minimum annual guaranteed return, typically ranging from 13% to 20% of the initial investment amount, to be paid monthly, even if the investor's website revenues were insufficient to pay that return. TGC backed these guarantees of high investor returns through claims of financial health, stating in the Consulting Performance Agreements that it was in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties."

8.  The representations made by Courtright and TGC were false. In fact, TGC's financial statements and bank records show that, from in or around January 2017 through October 2019, investor websites generated approximately $9 million in revenues from advertising and product sales. During the same time, TGC paid investors at least $30 million in investment returns. The gap of more than $20 million between the website revenues and payment of returns to investors was primarily funded, in classic Ponzi scheme fashion, through the offer and sale of Consulting Performance Agreements to new or repeat investors. TGC's investors were not told that the returns paid to them were funded through the sale of Consulting Performance Agreements to other investors.

9.  The only other significant source of funds available to TGC during this time frame were over $8 million in loans taken out by TGC, beginning in or around May 2019. Some of the loans were obtained from companies specializing in lending to distressed businesses. At the same time, TGC has continued to raise funds from investors through the offer and sale of Consulting Performance Agreements. TGC co-mingled investor funds with loan proceeds and used the co-

3

mingled funds to both pay contractually obligated returns to investors and to repay its loans. TGC did not advise its investors that it had resorted to outside lending in order to pay returns.

10. In December 2019, TGC's scheme became unsustainable. TGC notified its investors via e-mail on December 13, 2019, that it would put a temporary "moratorium" on the payment of returns as a result of unspecified "challenges and headwinds" encountered by TGC. TGC provided investors with several options, including exchanging their TGC investment for a one year interest bearing promissory note. None of the options included an immediate refund of the investors' money.

11. In response to the collapse of the Ponzi scheme operated by Courtright and TGC, the United States Securities and Exchange Commission ("SEC") filed a civil complaint before Judge Andrea Wood in the United States District Court for the Northern District of Illinois on or about December 27, 2019, case number 19 CV 8454, charging Courtright and TGC with violating Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C., Section 78j(b)) and Rule 10b-5 thereunder (17 C.F.R., Section 240.10b-5), and Section 17(a) of the Securities Act of 1933 (15 U.S.C., Section 77q(a)). In its Complaint, the SEC alleged that, from at least 2017 through October 2019, TGC and Courtright raised at least $75 million from more than 500 investors who entered into Consulting Performance Agreements with TGC, pursuant to which the investors would provide up-front payments to TGC and TGC promised to pay investors a minimum guaranteed rate of return into perpetuity. The SEC alleged that Courtright and TGC falsely told investors that their funds would only be used to build, buy, maintain or market websites on their behalf when, in fact, Courtright and TGC used the funds derived from the sale of Consulting Performance Agreements to pay returns to other investors, "in classic Ponzi-like fashion."

12. On December 30, 2019, Judge Wood entered a Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief ("TRO") and an Order Appointing Receiver in the SEC action. The TRO ordered a freeze on all assets of TGC, as well as the preservation of all documents, books and records of TGC pertaining to the investment fraud scheme described by the SEC in its complaint.

13. The Receiver's mandate was to take all actions necessary to implement the terms of the TRO by, among other things, taking possession, custody and control of all of the assets of TGC. On December 30, 2019, the Receiver obtained access to Courtright's residence, took control of the business assets that could be identified and secured the home office therein. In addition, the Receiver took control of the business operations of TGC, including having imaged, preserved and secured exclusive access to TGC's physical and electronic financial records, data, websites, accounts, domain names, computers, digital devices, e-mail, messaging and cloud-based accounts.

## FACTS ESTABLISHING PROBABLE CAUSE

14. The FBI initiated an investigation of Courtright and TGC in or about May 2019 based upon a referral from the SEC. In its referral, the SEC indicated that it had been in recent contact with Financial Institution A, which handled all of TGC's business banking accounts until approximately September 2018. Financial Institution A had serious concerns about the legitimacy and legality of an investment program run by Courtright and TGC. Specifically, Financial Institution A had reviewed financial statements for TGC and interviewed senior officers of TGC, including Courtright, and had come to the conclusion that TGC was using funds derived from its investors to pay returns to other investors. Financial Institution A was sufficiently

concerned about TGC's investment practices that it terminated its long standing lending and business banking relationship with Courtright and TGC and notified the SEC of its concerns.

15. According to Financial Institution A, Courtright established a personal checking account at the bank in or around 2008. Courtright and his wife subsequently opened additional personal accounts at the bank, as well as a number of business checking accounts on behalf of TGC and Income Store. Based on information I have received from the SEC, Courtright and his wife were the sole signers on the business accounts in the names of TGC and Income Store.

16. Based on public Illinois Secretary of State records I have reviewed, as of 2019, Courtright and his wife were TGC's only officers. Those records list Courtright as President and his wife as Secretary. Furthermore, based on information I have received from the SEC, including filings made in the SEC's case before Judge Wood, from approximately March 2009 through August 2019, Courtright was TGC's Chief Executive Officer and President, at which time Courtright's wife took over as TGC's President.

17. Until the SEC's action in December 2019, TGC also did business through a division known as The Income Store, which occupied an office in Lancaster, Pennsylvania. In its promotional materials and advertising that I have reviewed, TGC claimed at various times to have offices in Naples, Florida and Romania. It has also announced recently that it had plans to open offices in the Philippines and India. Until December 2019, TGC operated promotional websites which were located at www.incomestore.com and www.todaysgrowthconsultant.com, on which there were various promotional videos featuring discussions by Courtright, his wife and others concerning the services offered by TGC and Income Store. I have examined these two websites and the promotional videos featured thereon. According to Courtright, TGC and Income Store

were in the business of building or acquiring what he described as "authority sites." He explained in the videos that authority sites are websites containing expert content that are viewed for informational purposes by users. Courtright indicated in the videos that advertisers pay the owners of these authority sites for advertising rights on the websites, thereby generating revenues for the website owners. Courtright stated that TGC and Income Store accept an Upfront Fee from clients to either build such an authority site or purchase an existing authority site on behalf of the client. Courtright stated that TGC and Income Store then split the advertising revenues from these authority sites with their customers into perpetuity.

18. Since at least 2017, TGC has offered and sold investment contracts known as Consulting Performance Agreements to investors across the United States and the world through advertising on websites and via radio ads. I have reviewed a number of these agreements, most of which contain the same general terms describing the nature of the investment TGC offered, and most of which contain Courtright's address on the bottom of each page. These agreements guaranteed high returns to investors through the purchase of existing "income producing" websites or by constructing new "income producing" websites on the investors' behalf. The agreements required investors to pay a so-called "Upfront Fee" to TGC, and TGC was required to use the Upfront Fee exclusively for the purpose of acquiring or building revenue-generating websites for the investor and then to develop, maintain and market the websites. The agreements have principally been structured in a manner that require no effort from the investor beyond payment of the initial Upfront Fee, and investors were led to expect profits solely from TGC's expertise and efforts.

19. The Consulting Performance Agreements guaranteed investors a minimum return

on their investment. Pursuant to the terms of the Consulting Performance Agreements, investors were entitled to receive, in perpetuity, a monthly payment equal to 50% of the revenues generated by their websites; but, if website revenues did not exceed an agreed-to threshold dollar amount specified in the agreement, TGC promised to pay the investor the minimum return specified in their agreement. The threshold amounts varied from agreement to agreement, but typically were a percentage of the investor's Upfront Fee.

20. For example, one of the agreements I have reviewed was executed with an investor referred to here as Investor A. Investor A's agreement, which was entered into in August 2017 and executed by Courtright, provided Investor A with a guaranteed minimum payment of $3,896 per month, which was the monthly equivalent of 17% of the investor's $275,000 Upfront Free. Per the agreement, Investor A's payments from TGC were to continue for 60 years from the date of execution.

21. TGC's Consulting Performance Agreements also contained the representation that TGC was in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties."

22. As part of this investigation, I have interviewed Investor A. According to Investor A, when he asked to change the duration of his Consulting Performance Agreement from "in perpetuity" to "60 years," and suggested other proposed edits, TGC executives told him that Courtright had to approve the changes. This indicates that Courtright personally reviewed and approved Investor A's Consulting Performance Agreement. In addition, as noted above, Courtright's signature appears on Investor A's agreement.

8

## TGC sales of Consulting Performance Agreements

23. TGC's Consulting Performance Agreements contained an express representation that the investor's Upfront Fee would be used exclusively for the purchase, hosting, maintenance and marketing of revenue generating websites on their behalf. There was no disclosure that TGC would use any part of the investors' Upfront Fee for any other purpose. Investors were therefore led to believe by Courtright and TGC that TGC only earned its profits from its 50% share in website revenues, not from the Upfront Fees paid by its investors.

24. I have reviewed a report prepared by the Receiver in the SEC's case before Judge Wood. In the report, the Receiver noted that it had examined internal TGC records and, to date, those records indicate that, from 2013 to 2019, TGC and Courtright have raised in excess of $141 million in Upfront Fees from investors through the offer and sale of approximately 700 Consulting Performance Agreements.

25. As part of this investigation, I have reviewed various TGC financial statements from the time period January 2016 through July 2018, which I have obtained from several sources, including subpoenaed records from TGC's former accountant, the SEC and Financial Institution A. Based upon my review of these financial statements, and my review of the Receiver's report concerning TGC's financial records, TGC investor websites, collectively, generated revenues that were materially below the threshold amounts guaranteed by TGC. TGC nonetheless paid investors their guaranteed returns on a monthly basis, until December 2019, when it placed a moratorium on investor payments. From approximately January 2016 through October 2019, websites underlying TGC's Consulting Performance Agreements generated approximately $10.3 million in advertising revenues and revenues from the sale of third party products.

26. Based upon my review of TGC's financial statements and the Receiver's report, TGC paid returns to investors in excess of $35 million during the same time period. TGC has been paying investors the amounts guaranteed in their Consulting Performance Agreements. For example, according to a declaration that Investor A submitted as part of the SEC's case before Judge Wood, from January 2018 through November 2019, it paid Investor A exactly $3,896 per month, the amount guaranteed in his/her Consulting Performance Agreement.

27. TGC made up the shortfall between revenues and payment of investor returns by raising additional funds through the offer and sale of Consulting Performance Agreements and diverting a material portion of those funds to pay the existing investors. According to TGC's financial statements, from approximately January 2017 through October 2019, TGC raised approximately $75 million from investors through the offer and sale of new Consulting Performance Agreements.

28. As part of its civil case, the SEC submitted a declaration from Jeffery R. Anderson, an SEC Assistant Chief Accountant, who performed an analysis of various TGC bank accounts. The declaration is publicly available as docket entry 17 in case 19 CV 8454. According to Anderson's analysis of TGC's bank records, until May 2019, besides investor funds, TGC had no other source of revenue or funds that singly or collectively with website revenues and other funds were sufficient to cover the shortfall between website revenue and TGC's payment obligations to investors. (Anderson Declaration at 13.) Beginning in May 2019 and continuing through October 2019, TGC entered into loans, some with lenders specializing in distressed commercial lending, and received loan proceeds of at least $11 million. (*Id.*) TGC deposited the loan proceeds and Upfront Fees from investors into its principal commercial bank account where they became co-

mingled. (*Id.* at 14.) TGC then used the co-mingled funds to make its guaranteed payments to existing investors. (*Id.*) From approximately May 2019 through October 2019, TGC used the co-mingled funds to make approximately $8 million in payment of returns to investors and approximately $3 million in payments to its lenders. (*Id.*)

### Courtright admitted to the use of investor funds to pay returns

29. I have interviewed Bank Vice President A, the lending official of Financial Institution A who handled the bank's relationship with Courtright and TGC. During 2018, Bank Vice President A requested that TGC provide updated financial statements for 2018 and 2017, in connection with the bank's approval process for the renewal of lines of credit extended to TGC. Upon receipt of the financial statements from TGC, Bank Vice President A noted that TGC's website revenues for 2017 were less than $3 million, while its payments to investors topped $8 million. Similarly, in 2018, TGC's website revenues were less than $1 million, while its payments to investors exceeded $6 million. According to the financial statements reviewed by Bank Vice President A, TGC received over $16 million from investors in 2017 and, during the first seven months of 2018, TGC received another $16 million from investors. It was clear to Bank Vice President A that, based upon the financial statements, TGC could not have made the payments to investors without using the funds received from other investors.

30. Bank Vice President A had a subsequent conversation with TGC's Controller in August 2018. The TGC Controller told Bank Vice President A that TGC used investor funds to make payments to investors if the website revenues alone were insufficient to make the payments. This caused Bank Vice President A to question TGC's business model and caused him/her serious concerns about the bank's relationship with TGC.

31. Bank Vice President A had a conversation with Courtright in person at the bank on or about September 10, 2018, along with the Chief Financial Officer of TGC. Courtright confirmed to Bank Vice President A that TGC was, in fact, using funds received from investors to make payments to its investors in the absence of sufficient website revenues. Courtright said that TGC would continue to do so until website revenues increased enough to make the investor payments or TGC developed an alternative revenue stream. Courtright claimed to Bank Vice President A that investors signed contracts allowing Courtright to use in any way he wished at least 70% of the money investors contributed. As noted above in paragraph 23, however, the Consulting Performance Agreements represented that investor funds would be used exclusively for the purpose of acquiring or building web-sites for investors. Following the meeting, Financial Institution A closed all TGC accounts and terminated its relationship with TGC.

### The SEC Complaint and the Receiver's analysis of TGC

32. As noted above in paragraph 11, the SEC filed a civil complaint before Judge Andrea Wood in the United States District Court for the Northern District of Illinois on or about December 27, 2009. The SEC charged TGC and Courtright with fraud in the offering and sale of Consulting Performance Agreements to more than 500 investors from at least January 2017 through October 2019. The SEC alleged that, during this time, TGC and Courtright raised no less than $75 million from the sale of the Consulting Performance Agreements and that they paid at least $31 million in returns to investors "in classic Ponzi-like fashion" by using funds derived from other TGC investors. The SEC also charged that TGC and Courtright diverted millions in investor funds to pay Courtright's personal expenses, including his mortgage and private secondary school tuition, among numerous other personal expenses. The SEC further alleged that Courtright

12

falsely reported to investors that TGC would not use their Upfront Fees for any purpose other than building, buying, maintaining, or marketing websites on their behalf, when, in fact, he and TGC used the Upfront Fees to pay tens of millions in investor returns.

33. After the Receiver took possession and control of TGC's books and records in December 2019 and undertook an initial examination of the business, the Receiver issued a written initial report to the Court on or about January 30, 2020. The Report is publicly available as docket entry number 45 in the SEC's case, 19 CV 8454. The Receiver reported to the Court that its review of books and records:

> confirm the SEC's allegations that new investor funds and loans were used to pay the investors/["]website partners", not website revenue. For example, in 2018 website revenue was under $2M and website payout to investors was approximately $12.7M and likewise in 2019 website revenue was under $4M and website investor payout was $16.5M. ***In short, this was a Ponzi scheme***.

Report pg. 6 (emphasis added).

34. The Receiver further noted in its report that:

> ***without additional investor funds the operations were not sustainable even in the short term***. Even with substantial infusion of investor funds, the TGC/Income Store records indicate a loss in 2018 of ($5.7M) and in 2019 of ($7.5M). ***Indeed, the payroll expense alone exceeded the website/e-commerce revenue***.

*Id.* (emphasis added). Consequently, the Receiver terminated nearly all of TGC's 110 employees shortly after assuming control of the business and its books and records.

35. The Receiver's written report went on to state that:

> the Receiver has been able to confirm that the revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and certainly was not sufficient to cover both those monthly payments and TGC's monthly overhead expenses. Specifically, TGC's solicitation of investments from investors makes up the largest segment of its "revenue." Pursuant to the Profit and Losses accounting from the company's

records, in 2019 alone TGC generated "revenue" from investors of approximately $41.5 million and website income of $3,724,809.00. . . . During that same time period, TGC paid out $16.5 million to investors and operating expenses in the amount of $34,653,706, resulting in a net loss of $7,520,873 for 2019. Prior years reflect a similar discrepancy in revenues generated from investors in comparison with the amounts paid to investors based upon their investments. Therefore, TGC's business depended on the use of new investors' up-front payments (and perhaps loan proceeds) to cover its obligations to earlier investors much in the vain of a Ponzi scheme. As such, the Receiver believes that TGC's business was not sustainable.

Id. at 21-22.

36. The Receiver also concluded in the written report that:

the representations contained in the Consulting Performance Agreements entered into by TGC and the investors relating to TGC's financial condition and the use of the investor's funds . . . were not supported by TGC's own records. . . . Specifically, the investor's Upfront Fee was not used "exclusively for the purchase, hosting, maintenance and marketing of the revenue generating website …" and TGC for at least the past three years was not solvent or financially able to pay its bills when due (without the improper use of new investor funds) to meet its contractual obligations.

Id. at 22.

### Courtright used TGC funds to pay personal expenses

37. According to the Anderson declaration, since at least 2017, Courtright has transferred large sums of money from TGC's principal bank account containing co-mingled investor funds, website revenue and loan proceeds into his personal bank accounts. (Anderson Declaration at 14-15.) Courtright also transferred funds from TGC's principal bank accounts directly to third parties to pay for personal expenditures. (Id. at 15.)

38. For example, from January 2017 through October 2019, TGC transferred more than $1.5 million in cash from its corporate accounts to Courtright's personal bank accounts, including accounts held jointly with his wife. (Id. at ¶ 54.)

14

39. Between January 2017 and October 2018, TGC transferred more than $323,000 in mortgage payments to the bank holding the mortgage on Courtright's personal residence. (*Id.* at ¶ 55.) The transfers were in amounts that exceeded Courtright's monthly mortgage obligation. (*Id.*) Specifically, as of September 2017, Courtright's mortgage loan required monthly principal and interest payments of $2,729, but, between January 2017 and October 2018, TGC generally made *weekly* payments of $3,000 to pay down Courtright's personal residential mortgage. (*Id.*)

40. In 2018, among other payments made for Courtright's personal expenses, TGC paid more than $12,000 in tuition to a private secondary school; and, in 2019, it paid more than $24,000 to the same school. (*Id.* at ¶ 56.)

### TGC declared a "moratorium" on payment of investor returns

41. I have reviewed an e-mailed notice sent to investors on or about December 13, 2019, in which TGC disclosed that it was experiencing cash flow problems and was therefore placing a "moratorium" on investor payments for the next four months. The notice stated that TGC had "challenges and headwinds over the last year" and, as a result, website revenues were down and TGC has had to "deploy more cash than we anticipated" in order to support investors' websites.

### Use of interstate wire communication

42. Investor A's Upfront Fee payment of $275,000 was transmitted to TGC's principal bank account at Financial Institution A using the Fedwire funds transfer system on or about September 7, 2017. Fedwire is an electronic interbank funds transfer system operated by the Federal Reserve.

43. Based upon my training and experience, and my interviews of Federal Reserve

employees in prior investigations, I know that Fedwire does not process wire transfers in Illinois but rather in New Jersey and/or Texas. Thus, Fedwire transfers received by Financial Institution A, which is located in Illinois, are interstate wire transactions.

## CONCLUSION

44. Based upon the information set forth above, I respectfully submit that there is probable cause to believe that, from in or about January 2017 and continuing through about October 2019, Kenneth D. Courtright engaged in a scheme or artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and, for the purpose of executing such scheme or artifice or attempting so to do, caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, in violation of Title 18, United States Code, § 1343 (wire fraud), namely an interstate wire transfer of $275,000 from Investor A to TGC's bank account at Financial Institution A on or about September 7, 2017.

FURTHER AFFIANT SAYETH NOT.

_____
Brent E. Potter
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 4th day of February 2020, at Chicago, Illinois.

_____
The Honorable Jeffery I. Cummings
United States Magistrate Judge
Northern District of Illinois

16