UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 20 CR 77 |
| | ) | Judge Matthew F. Kennelly |
| KENNETH D. COURTRIGHT | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL**

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby provides its response to defendant Kenneth Courtright's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. [Docket #168.] After an eight-day trial in this case, a jury convicted defendant on seven counts of wire fraud. The evidence at trial established that defendant defrauded investors who provided money to his company, Today's Growth Consultant, which did business as the Income Store ("TGC"). Thus, for the reasons set forth below, defendant's motion should be denied.

**I.     Factual Background[1]**

At trial, the government presented substantial evidence showing that defendant devised and participated in a scheme to defraud. More specifically, defendant made and caused to be made false and fraudulent representations about TGC to obtain funds from investors. The false and fraudulent representations included: (1) that investor funds would be used to purchase, maintain, market, or construct websites that would be owned by the investors, when in fact defendant used the funds in part to pay guaranteed minimum monthly payments owed to other investors; (2) that TGC made substantial amounts of money, referred to as overages, from websites it owned or

---

[1] Citations to government exhibits admitted into evidence at trial are cited as "Ex." followed by the exhibit number. Citations to the trial transcript are cited as "T. Tr." followed by the page number.

managed that it used to pay guaranteed minimum monthly payments owed to investors, when that was not true and monthly payments were funded in part by money coming from new investors; and (3) that TGC was in good financial condition, when in fact TGC was not generating sufficient revenue from any source other than money coming in from new investors to pay its operating expenses, including what it owed each month to investors, and obtained merchant cash advances that essentially operated as loans with extremely high interest rates. Evidence at trial showed not only that these representations were false, but that defendant knew as much.

Defendant, through TGC, entered into "Consulting Performance Agreements" ("CPAs") with the investors, who were referred to in the agreements as "Site Partners." (Ex. 1.) Pursuant to the terms of the CPAs, the Site Partners paid an "Upfront Fee" to TGC "exclusively" for "the purchase, hosting, maintenance, and marketing" of websites designed to generate advertising revenues. (Ex. 1. at 6.) The websites were to be the "sole property" of the Site Partner. (Ex. 1 at 1.) The CPAs guaranteed the Site Partners a monthly payment "into perpetuity" equal to the greater of 50% of the advertising revenues generated by websites assigned to the Site Partner or the monthly equivalent of at least 15% of the Site Partner's Upfront Fee. (Ex. 1 at 3, 7.) The CPAs also stated that TGC was "in satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties hereunder." (Ex. 1 at 6.) Evidence at trial showed that defendant electronically signed numerous CPAs, (Exs. 1-3, 6-8, 20, 26-27, 36), and his approval was required for any changes to the terms. (T. Tr. at 257, 624, 674.)

Defendant made statements like those contained in the CPAs in person to potential and existing Site Partners to solicit investments. At trial, Site Partners testified about meetings with defendant or statements that he made during sales conferences they attended. Defendant told Site

Partners at these meetings and conferences that their Upfront Fees would be used to build, maintain, or market a website that the Site Partner would own. (*See, e.g.*, T. Tr. at 238, 244-245, 261, 276, 403-404, 410, 414-416, 489-490, 669, 674-675, 682, 824-825.) He also orally explained to Site Partners that he could fund their guaranteed minimum payments, regardless of how their website performed, based on overages from other sites TGC owned or managed. (*See, e.g.*, T. Tr. at 239, 255, 408-409, 420, 423, 671-672, 682.) Finally, he orally explained to Site Partners that TGC was in good financial condition and able to pay its bills when due. (*See, e.g.*, T. Tr. at 239, 261, 270, 407, 410, 413, 423, 673, 782, 825.) Site Partners further explained that defendant's representations about how their funds would be used, about the guaranteed minimum payments, and about the financial condition of TGC were important to their decision to invest. (*See, e.g.*, T. Tr. at 245-46, 282, 348-349, 413-414, 489, 672, 688, 829-830.)

Testimony and documentary evidence at trial showed that the representations defendant made to Site Partners both orally and in the CPAs were not true. Former TGC financial employees testified that Upfront Fees were used to pay all of TGC's expenses, including guaranteed minimum payments owed to Site Partners; that TGC was continually having financial difficulties, so much so that defendant obtained the merchant cash advances; and that websites were not generating overages sufficient to pay the monthly commitments owed to Site Partners. (*See, e.g.*, T. Tr. at 570-571, 573, 589, 869-874, 900, 906, 959-960, 966, 1203-1204.)

This testimony was confirmed by a financial analysis completed by an FBI Forensic Accountant who testified at trial. A summary of the analysis showed, among other things, the inflows into and outflows out of TGC's bank accounts from 2015 through 2019. As seen in summary charts admitted into evidence, the biggest inflow into TGC's bank accounts during that

3

time-period was money from Site Partners—a total of $132,594,444, which was 80% of all the inflows into TGC's bank accounts. (Ex. 75.) The next biggest inflow was $15,553,587 from business financing/loans, which mostly consisted of merchant cash advances. (*Id.*) Finally, during this time-period, defendant's company generated only $12,241,151 in actual revenues from websites. (*Id.*)

The financial analysis also showed that the biggest outflow from TGC's bank accounts from 2015 through 2019 was $49,288,959 paid to Site Partners. (*Id.*) As the analysis showed, and witnesses who worked at TGC confirmed, for each year from 2015 through 2019—both individually and in aggregate—TGC had no way to pay the amounts due to Site Partners other than by using money coming in from new Site Partners, which was directly contrary to what defendant told potential Site Partners both in writing and in person.

Finally, the financial analysis showed amounts defendant took for himself. Specifically, approximately $2,923,740 was transferred from TGC's bank accounts to defendant's bank accounts. (*Id.*) Also, approximately $539,715 was used from TGC's bank accounts to pay defendant's home mortgage and $436,738 was used on tuition for defendant and his family. (*Id.*) All this for a company that generated only approximately $12 million in revenue from websites from 2015 to 2019.

In addition to the fundamental financial problems described above, substantial evidence was presented at trial about the acute financial difficulties TGC faced in the Fall of 2019. For example, during that time-period, defendant obtained the merchant cash advances, against the advice of his financial employees. (T. Tr. at 1215.) In some instances, the merchant cash advances had implied interest rates of over 200%, requiring TGC to pay tens of thousands of dollars per day.

(Ex. 90.) Site Partner funds were used to pay back the merchant cash advances, (T. Tr. 908), which was contrary to what Site Partners were told.

Moreover, defendant was directly put on notice of the financial issues at TGC and took affirmative steps to hide those issues from Site Partners. For example, on October 17, 2019, TGC's controller sent an email to defendant and others in which he noted that TGC had $900,000 in cash on hand and needed approximately $6,000,000 in the next month. (Ex. 70.) The email noted that $1,830,000 was needed for payments to Site Partners that were already late because they were due on October 15, that credit cards were "maxed out," and that other bills were "well past due." (*Id.*) The controller proposed an email to Site Partners, the language of which had already been approved by TGC's new CEO, disclosing that a "financial restructuring" caused the delay of monthly payments to Site Partners. (*Id.*) Instead of approving language disclosing this financial restructuring, defendant changed the language sent to Site Partners to say only that "we were not able to process all partner payments in one day." (Exs. 71 and 72.) Even after being put on direct notice of TGC's financial issues, defendant continued to raise money from Site Partners and represent that TGC was in good financial condition. (Exs. 8 and 36.) Despite the clear financial issues TGC was encountering, he also continued to seek money for himself. (Ex. 85.)

During the trial, the jury also heard testimony from defendant, who took the witness stand in his own defense. Defendant's testimony was wholly incredible, as the jury found by virtue of its verdict. Throughout his testimony, defendant attempted to concoct a false narrative that a specific section of the CPAs that referenced "draws" allowed him to return a portion of each Site Partner's Upfront Fee back to them as the guaranteed payment every month. (*See, e.g.*, T. Tr. at 1606-1608.) As part of this assertion, defendant claimed that the guaranteed minimum payments

5

were not really in perpetuity, (T. Tr. at 1680-1681), despite the clear language of the CPAs and his statements to Site Partners.

Defendant's testimony contradicted the evidence set forth during the trial. The jury was entirely correct in rejecting it for several reasons.

First, despite defendant's testimony on direct examination, (T. Tr. at 1605), the "draw" provision language was not in every Consulting Performance Agreement. (T. Tr. at 1673-1685.) This shows that the provision was not a critical portion of the CPAs that carried some great significance, as defendant testified. (T. Tr. at 1672.)

Second, as noted above, defendant told Site Partners that their money would be used solely to purchase, maintain, construct, or market a website for them, and that they would receive a guaranteed minimum payment each month in perpetuity. None of the Site Partners mentioned any claim that defendant would be simply returning their Upfront Fee to them each month. In fact, Site Partners testified that defendant told them their money would be used for no purpose other than their websites. (*See, e.g.*, T. Tr. 261, 276, 414-416, 669, 682, 825.) Thus, defendant did not tell the Site Partners that their money could be returned to them as guaranteed minimum payments.

Third, defendant's testimony is contradicted by the terms of the CPAs themselves, which do not support what he claimed on the stand. The CPAs do not say that defendant could return each Site Partner's Upfront Fee as part of the guaranteed minimum payment, and in any event, defendant admitted that his company did not segregate funds from Site Partners to track how much of their Upfront fee had been paid back to them. (T. Tr. at 1699.) Thus, even under defendant's theory, he used Upfront Fees from new Site Partners to pay the guaranteed minimum payment obligations he owed to earlier Site Partners.

Fourth, if defendant were simply providing Site Partners their money back, he could not do so in perpetuity, as he promised both in the CPAs and orally to Site Partners, because the Upfront Fee would eventually run out. When asked questions about this on cross examination, defendant incredibly claimed that "in perpetuity" did not mean what it said. (T. Tr. 1680-1681.)

Finally, on cross examination, defendant was confronted with Government Exhibit 92. That exhibit was a script that defendant prepared and sent to TGC employees about frequent Site Partners complaints. Complaint number 2 listed in the script is "Ponzi scheme—how is it possible that this is a sustainable business when all it appears is that you are paying me back with the money that I invested, as my portfolio is not producing any revenue." In his drafted response, defendant did not simply say "yes" and refer his employees to the portion of the CPA that purportedly allowed him to provide money back to Site Partners each month. Instead, defendant drafted a response that is similar to the responses Site Partners testified they received from defendant when they asked him questions, namely, that his company had "hundreds" of assets with no Site Partners, implying that TGC had revenue streams that could fund the guaranteed minimum payments, which was not true.

## II. <u>Legal Standards</u>

In deciding a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, a court does not re-weigh the evidence or judge credibility of witnesses. *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000). Rule 29 provides in pertinent part that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant making a sufficiency of the evidence challenge "bears a heavy burden and faces a nearly insurmountable hurdle." *United States v.*

*Seawood*, 172 F.3d 986, 988 (7th Cir. 1999). A jury verdict may be overturned only where the record contains no evidence, viewed in the light most favorable to the government, from which a rational trier of fact could find guilt beyond a reasonable doubt. *United States v. Vallar*, 635 F.3d 271, 286 (7th Cir. 2011); *United States v. Rea*, 621 F.3d 595, 601 (7th Cir. 2010).

### III.   Argument

Defendant is not entitled to judgment of acquittal. The evidence presented at trial was more than sufficient for a reasonable jury to conclude that defendant engaged in a scheme to defraud involving materially false and fraudulent representations made to Site Partners and interstate wire transfers in furtherance. Defendant's Rule 29 motion is based on recycled arguments that the jury rejected at trial and ignores the relevant legal standard and controlling law on wire fraud. Because defendant's arguments have any no basis in law or fact, his motion should be denied.

To start with, the evidence at trial showed that defendant made false statements both orally and in the CPAs about, among other things, how Site Partner funds would be used, the existence of overages that could fund guaranteed minimum payments promised to Site Partners, and TGC's overall financial health. Site Partners testified that statements on these topics were material to their decision to invest in TGC. Also, the seven wire transfers charged in the indictment as executions of the scheme were all wire transfers of money from Site Partners to TGC, which the jury reasonably and logically concluded were in furtherance of defendant's scheme to fraudulently obtain money from Site Partners.

In his Rule 29 motion, defendant focuses on the government's proof about only two false statements—TGC's financial condition and how investor funds would be used. In doing so, he ignores the clear false statements proven at trial about purported overages—that is, the false

8

statements defendant made to investors about how TGC could fund guaranteed minimum monthly payments even if Site Partners' websites were not making money. Defendant falsely told Site Partners that those payments could be made based on overages from other sites his company owned or managed, which was not true. The false statements about the overages alone are enough to support the jury's verdict in this case.

Regarding TGC's financial health, defendant claims that the provision in the CPAs about TGC's financial condition is too vague to constitute a false statement. The provision reads as follows: "Today's Growth Consultant represents and warrants to [Future Site Owner] that Today's Growth Consultant is in satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties hereunder." Defendant made similar statements to prospective Site Partners in person.

These representations about TGC's financial health were not too vague to be false. The jury did not require testimony about the meaning of any terms to conclude that defendant falsely represented TGC's financial health. There was evidence from which the jury could reasonably conclude that TGC was not in satisfactory financial condition throughout the time-period of the charged scheme. For example, summary charts entered into evidence showed that in every year from 2015 through 2019, TGC did not generate enough revenue from any source other than money coming in from new investors to pay its operating expenses (*i.e.*, its bills), including what it owed to Site Partners. (Exs. 75-80.) The summary charts also showed that the biggest inflow into the company's bank accounts was Upfront Fees from new Site Partners, and not money derived from revenue that the company generated. (*Id.*)

And if that were not enough, every single government witness with responsibility for TGC's financial statements testified that new Site Partner funds were used to pay back the monthly commitments owed to Site Partners. In fact, TGC's CFO testified that in *every* month but one he was employed at TGC revenues were not enough to cover monthly payments owed to Site Partners. (T. Tr. at 1204.) Furthermore, in 2019, as detailed above, TGC was undergoing a significant cash flow shortage, which caused defendant to seek out merchant cash advances with what amounted to exorbitant interest rates.

These facts, taken collectively or on their own, were enough for a reasonable jury to conclude that the representations both orally and in the CPAs about TGC being in satisfactory financial condition were materially false. A reasonable jury could easily conclude that TGC was not in good financial condition, and that defendant was lying when he said otherwise, given that the company had little revenues, substantial commitments to Site Partners, was obtaining merchant cash advances, and was using new Site Partner funds to pay amounts owed to Site Partners as guaranteed minimum payments.

Next, defendant argues that testimony from Site Partners about the use of Upfront Fees was too generalized to constitute false statements. This argument is incorrect both legally and factually. First, in making this argument, defendant misunderstands the law on wire fraud and incorrectly seeks to impose additional requirements on the government's proof. Contrary to defendant's argument, the government was not required to prove that Site Partner funds related to specific counts were used to pay guaranteed minimum payments to other Site Partners. Instead, the government proved exactly what this Court instructed, namely, that:

- Defendant knowingly devised or participated in a scheme to defraud as described in Count 1.

10

- The defendant acted with intent to defraud.

- The scheme to defraud involved a material false or fraudulent pretense, representation, or promise.

- For the purpose of carrying out the scheme or attempting to do so, the defendant caused an interstate wire communication to take place, as charged in the particular count you are considering.

(T. Tr. at 1762-1763.)

As this Court instructed the jury, the executions charged in the indictment need only further the scheme; they are not required to contain false or fraudulent statements themselves. *See, e.g.*, *United States v. Sheneman*, 682 F.3d 623, 629-30 (7th Cir. 2012); *United States v. Powell*, 576 F.3d 482, 493 (7th Cir. 2009). Defendant's whole premise that executions need to be tied to false statements in specific transactions is incorrect. The Court explained as much to defense counsel at the jury instruction conference. (T. Tr. at 1638.)[2] Moreover, the jury was entirely correct in determining that the wire executions charged in the indictment furthered the scheme because those

---

[2] The following exchange occurred at the jury instruction conference regarding the wire fraud jury instruction:

>MR. LEONARD: I think it's not clear that there has to be a statement that relates to each count. It can't just be a statement in the air that's – under this –
>
>THE COURT: Yes? You think there has to be a statement that relates to the particular count?
>
>MR. LEONARD: I do.
>
>THE COURT: You are mistaken.
>
>MR. LEONARD: Okay.
>
>THE COURT: That objection is overruled.

(T. Tr. 1638.)

executions resulted in TGC receiving money from Site Partners, which was the whole object of the scheme. Thus, defendant's argument should be rejected on this ground alone.

Defendant's claim is also flawed as a factual matter. There was more than enough evidence from which the jury could conclude that defendant lied to Site Partners when he said that their money would be used to purchase, build, or maintain a website for them. The evidence at trial showed that Site Partner funds were used in large part not on websites for the individual Site Partners but instead to meet the guaranteed minimum payment obligations owed to other Site Partners.

To try and counter this strong evidence on the use of Site Partner funds, defendant resurrects his argument from trial regarding so-called "draws," which he says allowed him to return Upfront Fees to Site Partners every month as part of the guaranteed minimum payment. In making this claim, defendant asks this Court to accept his fanciful testimony as true and not view the evidence in a light most favorable to the government. Nothing in the CPAs contain "clear and express language" supporting defendant's theory on draws. The evidence detailed above on pages 5-7 was more than enough for the jury to conclude that defendant was lying about the draw provision and the effect it had on the use of investor funds.

Finally, defendant goes count by count attempting to show how the evidence related to each execution is insufficient as a matter of law. In every instance, however, his arguments suffer from the same flaw detailed above. The government was not required to show false statements related to the particular counts. Instead, it was required to prove only that each wiring alleged in a count was in furtherance of the scheme. Each wiring was in furtherance of the scheme because the wirings provided TGC with money from Site partners. Thus, defendant's claim that the executions

12

are not tied to specific false statements or transactions is equally unavailing to his arguments about specific counts.

Again, defendant is also wrong on the facts. With one exception, each Site Partner witness tied to a wire execution either dealt directly with defendant or he signed the CPA for that Site Partner. As a result, defendant made false statements to these Site Partners either in person or in writing. The jury could reasonably conclude that these statements in person and in writing through the CPAs were false based on the forensic accountant's testimony, which showed how Site Partner funds were used, and the testimony from TGC financial employees, which showed that Site Partner funds were not used for purposes related to websites but instead for guaranteed minimum payments. The government was not required to present an individual tracing of each Site Partner's funds given the overall testimony and evidence showing how pervasively Site Partner Upfront Fees were used to pay back guaranteed minimum payments.

Based on defendant's arguments, two specific counts require additional discussion. First, with respect to Count Six, defendant did not solicit the Site Partner related to this count or sign the Site Partner's Consulting Performance Agreement. However, that does not matter because, again, the government need not tie false statements to wire transmissions. This Site Partner's wire transfer that was included in Count Six was still in furtherance of the scheme because it was money that a Site Partner provided to defendant's company. The government presented evidence, and argued to the jury, that this wire transmission was reasonably foreseeable to defendant, and the jury was presented with evidence through which it could agree. (T. Tr. at 1777.) Defendant did not argue otherwise at trial or in his Rule 29 motion.

With respect to Count Seven, the wiring in this count relates to a CPA that defendant himself signed in November 2019, (Ex. 8 at pg. 12), a time in which evidence presented at trial showed that TGC was in significant financial distress because of merchant cash advances that defendant obtained to keep TGC afloat and to pay back what was owed to Site Partners every month. Defendant argues that David Kelley, TGC's then-CEO, told the Site Partner related to this count about financial problems that TGC was undergoing prior to the time that the Site Partner invested.[3]

In advancing this argument, defendant simply ignores testimony from the Site Partner, which the jury was free to credit. According to the Site Partner, though he had conversations with Kelley, the "only contact regarding that consulting performance agreement was Ken Courtright." (T. Tr. at 399.) Also, as part of the signed CPA related to this count, the Site Partner testified that defendant promised him specific websites, (T. Tr. 367-368), which language was incorporated into the CPA that defendant signed. (Ex. 8 at 1.) Evidence at trial showed that the funds this Site Partner provided were spent on the same day TGC received them and used not on websites for the Site

---

[3] In his motion, defendant references this Site Partner being told that TGC was "in huge trouble and its financial condition did not look good." However, the quote he uses was not admissible evidence because it was part of a question for which this Court sustained an objection:

> Q: And during that meeting, you told the government that you participated in a telephone conference with David Kelley about two weeks after your visit to Lancaster. You asked Kelley whether he had seen Income Store's financial statements. Kelley did not answer directly but said that he was a certified public accountant and he understood the financial condition of the company. Kelley told McClure that Income Store was in huge trouble and its financial condition did not look good.
>
> That's what you said to the government, correct?
>
> MR. YONAN: That's improper impeachment, your Honor.
>
> THE COURT: Sustained in that form.

(T. Tr. 394.)

14

Partner but instead mostly to pay down the company's credit cards and merchant cash advances. (Ex. 82.) And of course, defendant signed this CPA in November 2019, representing that the company was in satisfactory financial condition, when as noted above, in the Fall of 2019, TGC was desperate for cash to pay back what it owed to Site Partners and to merchant cash advance companies.

Finally, there is no merit to defendant's overarching argument that Site Partners could not identify any false statements he made to them. That should come as no surprise since the Site Partners did not have access to TGC's bank statements or other financial materials to be able to identify the ways defendant misled and lied to them. The jury, and not individual Site Partners, was able to see the entirety of the evidence about what defendant told Site Partners, including his false statements to them about the way that TGC would use their funds and TGC's financial condition. When able to weigh all this evidence, the jury correctly concluded that defendant devised and participated in the charged scheme to defraud.

IV. **Conclusion**

For the reasons stated above, defendant's motion should be denied [#168].

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:  /s/ Jason A. Yonan
JASON A. YONAN
ADAM L. ROSENBLOOM
Assistant U.S. Attorneys
219 S. Dearborn St, Rm. 500
Chicago, Illinois 60604
Dated: September 29, 2023           (312) 353-5300