IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No. 20 CR 77 |
| | ) | |
| KENNETH COURTRIGHT | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

After a seven-day trial, a jury found defendant Kenneth Courtright guilty on seven counts of wire fraud in violation of 18 U.S.C. § 1343. Mr. Courtright has moved for entry of a judgment of acquittal.

In considering a motion for judgment of acquittal, the Court views the evidence in the light most favorable to the government and asks whether any rational trier of fact could have found the elements of the charged offenses beyond a reasonable doubt. *See, e.g., United States v. Jarigese*, 999 F.3d 464, 470-71 (7th Cir. 2021). To establish wire fraud, the government is required to prove that there was a scheme to defraud that involved at least one material false or fraudulent pretense, representation, or promise; the defendant knowingly participated in the scheme with the intent to defraud; and the defendant caused an interstate wire communication in furtherance of the scheme. *See, e.g., United States v. Chanu*, 40 F.4th 528, 539 (7th Cir. 2022); *United States v. Meza*, 983 F.3d 908, 916 (7th Cir. 2020). The Court notes that although the indictment alleged a number of false representations and promises, the government was not required to prove all of them; one material false representation or promise (together with the other

elements of the offense) will do.

The evidence at trial, viewed in the light most favorable to the government as required on a post-trial motion, showed the following. Mr. Courtright owned and operated a company called Today's Growth Consultant, which did business under the name The Income Store. He solicited investors—referred to as "site partners"—to put up money that would be used to purchase, create, market, and/or maintain websites designed to generate operating revenues.

An investor would enter into an agreement with The Income Store called a "consulting performance agreement." Under the agreement, the investor/site partner would pay an upfront fee which the agreement represented was "exclusively" for the "purchase, hosting, maintenance, and marketing" of the website. Significantly, the agreement guaranteed the site partner a monthly payment "into perpetuity" equal to the greater of two figures: 50 percent of the advertising revenues generated by the site partner's website, or the monthly equivalent of at least 15 percent of the site partner's upfront fee. In other words, the agreement guaranteed a perpetual 180 percent annual return on the site partner's investment. These agreements' terms were approved by Mr. Courtright, and he authorized and directed the use of the agreements with the site partners.

The evidence also showed that Mr. Courtright made, at least to some potential investors, verbal statements similar to those in the agreements to induce them to invest. He explained, on at least some of these occasions, that the monthly guaranteed payments to investors could be repaid from overages from other websites that The Income Store owned or managed. Mr. Courtright also represented verbally—as the

consulting performance agreements did in writing—that The Income Store was in satisfactory financial condition, solvent, able to pay its bills when due, and able to perform its duties under the agreement.

The evidence at trial showed, however, that the investors' upfront fees, contrary to Mr. Courtright's written and verbal representations, were used to pay *nearly all* of The Income Store's expenses—including payments to other investors—and not just the expenses to acquire, market, and maintain the particular investor's website. Among other testimony, a forensic accountant testified that only about $12 million came in from website income but that about $49 million was paid to site partners. And the expenses that investors' initial payments were used for did not include only business-related expenses. The evidence showed that funds were transferred from The Income Store's accounts (derived in part from site partners' upfront payments) to pay Mr. Courtright's home mortgage payments, totaling over $500,000, and tuition for family members, totaling over $400,000.

The evidence showed that the websites *never* generated sufficient revenues to make the minimum monthly payments that Mr. Courtright had committed to pay to investors. The jury reasonably could infer that there was not, at any time relevant to the charges, any basis to believe otherwise and that Mr. Courtright in fact did not believe the truthfulness of his and the agreements' contrary representations to potential investors. Rather, at relevant times, payments by later investors (which they had been told would be used only to acquire and maintain *their* websites) were used, along with borrowed funds, to make the monthly payments to earlier investors. In short, the evidence was sufficient to permit the jury to find beyond a reasonable doubt that the

guarantee of a 15 percent monthly/180 percent annual return was false, if not from the outset then at least at all times relevant to the charged offenses, and that Mr. Courtright knew this.

The evidence also showed that The Income Store was in chronic financial difficulty—in the sense of being unable to make required payments from earned revenues—throughout all or at least most of its existence during the charged period, though less so at the outset of that period. As time went on, Mr. Courtright was required to rely increasingly on borrowed funds, which for the most part were high-interest loans. This, in turn, generated additional obligations on the company's part—repaying the loans and interest—for which investor funds were used, contrary to the representations made to the investors in the consulting performance agreements.

The evidence, taken in the light most favorable to the government, was sufficient to permit the jury to find that Courtright was aware of the company's increasing financial problems and that, in at least one instance, he directed a misleading communication to site partners that minimized the company's financial troubles. He also continued, despite this awareness, to solicit funds from new investors—still making the same sorts of representations (at least those in writing) that he had made all along.

Taken as a whole, the evidence was sufficient in the Court's view to prove each of the essential elements of the charged offenses beyond a reasonable doubt. The scheme consisted of, at a minimum, making knowingly false representations to site partners about the returns they would receive and the use of their funds, to induce them to invest; these false representations were material to site partners' decisions to invest; Mr. Courtright knowingly participated in making and directing the making of those

representations; he did so with the intent to defraud the site partners; and he caused the charged wire communications to be made in furtherance of the scheme.

In his motion, Mr. Courtright argues, or at least appears to argue, that the government did not connect any particular false statement with any particular count. By "count" Mr. Courtright appears to be referring to the particular wire communication alleged in each count of the indictment. The law does not require, however, linking a particular false representation or promise to a particular wire transmission; "even a routine or innocent use of the wires may satisfy [the wire-in-furtherance] element so long as that use is part of the execution of the scheme." *See, e.g., United States v. Sheneman*, 682 F.2d 623, 629-30 (7th Cir. 2012); *see also, e.g., United States v. Powell*, 576 F.3d 482, 493 (7th Cir. 2009). That aside, the evidence showed that *every* investor (or, at least, nearly all of them), including those whose wire transfers were referenced in specific counts, was induced to invest by way of material false representations, made or directed and authorized by Mr. Courtright, regarding the returns guaranteed to them and how their initial investments would be used.

Mr. Courtright also points to provisions in the consulting performance agreements that may be read to authorize making an investor's required monthly payments from the investor's *own* upfront investment. But even if that is a correct reading, it did not wipe out the represented limitations on how the initial investments would be used, but rather simply added an additional authorized purpose. In other words, the "draw" term cannot viably be read to authorize an investor's initial investment to be used to repay other investors or, for that matter, outside lenders. That aside, the "draw" term will not bear anything close to the weight that Mr. Courtright attempts to put on it. The key fraudulent

5

representation was the promise to pay perpetual 180 percent annual returns. The proposition that an investor's initial funds could be used for these payments does not serve to make them any less false from the outset or any less knowingly so. An investor's initial 100 dollars can't magically become 180 dollars, let alone 360 or 540—absent other sources of revenue, of which the lion's share was other investors' payments.

In addition, it is not the case, as Mr. Courtright contends, that the company's financial problems existed only in the final months of 2019. And irrespective of the company's overall financial condition and its solvency, there was evidence sufficient to permit the jury to find that there was *never* anywhere near enough revenue from website income to make the guaranteed monthly payments to investors, which is how they were told the funds to make the payments would be generated. And there was likewise evidence sufficient to permit the jury to find that the site partners' investments were always, or nearly always, used for purposes other than what their agreements authorized—not just in the final months before the business collapsed. The evidence was also sufficient to permit the jury to find that Mr. Courtright was fully aware of all of this at the times relevant to the charged offenses.

Mr. Courtright contends that at the time of most of the wire transfers that were alleged in the specific counts of the indictment, the representations that the company was able to pay its bills was accurate, or at least not knowingly false. Perhaps so, at least on some of the dates in question. But the representations regarding The Income Store's financial health are not the only, or even the primary, misrepresentations that the indictment alleged. As indicated, the evidence showed that, via the consulting

performance agreements and sometimes verbal representations, Mr. Courtright promised *all* his investors—including those whose wire transfers were alleged in specific counts—a guaranteed return, and a spectacular one: 180 percent per year, in perpetuity. The evidence adduced at trial was sufficient to permit a reasonable jury to find that there was absolutely no way that this was *ever* a promise that Mr. Courtright or The Income Store could have fulfilled, and that he knew that at the times relevant to the charged offenses.

Mr. Courtright also notes, accurately, that some of the victims who testified at trial, and whose wire transfers were alleged in specific counts, either did not speak with him directly, or did not believe he had made any misrepresentations to them. But their personal opinions on the latter point are of no consequence regarding whether there actually *were* material misrepresentations. And nothing in the indictment or the law required the government to prove direct oral communications between Mr. Courtright and any victim (he cites no authority suggesting this is required). The evidence was sufficient to show that Mr. Courtright approved, authorized, and directed the use of the contractual language that promised the guaranteed, perpetual returns; he was in charge of, and directed, those who *did* deal directly with investors; and he did all of this, and continued to do so, through the end of 2019, knowing full well that the company could not fulfill the extravagant promises it had made.

In addition, Mr. Courtright points out that the government did not trace the funds of any particular wire transfer alleged in the indictment to a payment to some other investor. The short answer is that the government was not required to do so. The government was entitled to prove in the aggregate that this was happening—which it

7

did; it was not required to trace particular payments. Mr. Courtright cites no authority suggesting otherwise.

Regarding an investor named McClure whose wire transfer is referenced in a count of the indictment (Count 7), Mr. Courtright contends that he invested even after being told by The Income Store's CEO that the company was in financial trouble. This is perhaps best understood as an argument regarding the materiality of the representations regarding the company's financial health. But the Court struck the question by defense counsel that included this claimed statement by the CEO (a ruling Mr. Courtright does not challenge), and in any event other evidence showed that the funds transferred to The Income Store by Mr. McClure went out the door within a day after receipt, largely to pay down outside debt—contrary to the express representations in the investor's consulting performance agreement.

## Conclusion

For the reasons stated above, the Court denies defendant's motion for a judgment of acquittal [dkt. no. 168]. The sentencing hearing set for January 18, 2024 will proceed as scheduled.

Date: December 27, 2023

_____
MATTHEW F. KENNELLY
United States District Judge